**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **PHILIP CANNATA** | § | |
| | § | |
| **V.** | § | **A-10-CA-375 LY** |
| | § | |
| **CATHOLIC DIOCESE OF AUSTIN/** | § | |
| **ST. JOHN NEUMANN CATHOLIC** | § | |
| **CHURCH** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

Before the Court are the following dispositive motion and the associated responsive briefs:

(1)   Defendants' Second Motion to Dismiss Pursuant to FRCP 12(b)(1) and Motion for
      Summary Judgment Pursuant to FRCP 56 (Clerk's Doc. No. 84)

        •   Plaintiff's Response and Opposition to Defendants' Second Motion to
            Dismiss and Motion for Summary Judgment (Clerk's Doc. No. 89)

        •   Plaintiff's Amended Response and Opposition to Defendants' Second Motion
            to Dismiss and Motion for Summary Judgment (Clerk's Doc. No. 106)

        •   Defendants' Reply to Plaintiff's Amended response and Opposition to
            Defendants' Second Motion to Dismiss and Motion to Strike Attached
            Affidavits (Clerk's Doc. No. 110)

        •   Defendants' Reply in Support of Second Motion to Dismiss and Motion for
            Summary Judgment (Clerk's Doc. No. 92)

        •   Plaintiff's Surreply in Opposition to Defendant's Second Motion to Dismiss
            and Motion for Summary Judgment (Clerk's Doc. No. 105).

The District Court referred this motion to the undersigned for report and recommendation.

The parties have also filed a host of evidentiary motions related to the summary judgment

and dismissal motions.  These (along with their responsive pleadings) are:

(1)     Defendants' Motion to Allow Evidence Discovered After Discovery Deadline (Clerk's Doc. No. 91)

- •    Plaintiff's Response to Defendants' Motion to Allow Evidence Discovered After Discovery Deadline (Clerk's Doc. No. 95)

- •    Defendants' Reply to Plaintiff's Response to Motion to Allow Evidence Discovered After Discovery Deadline (Clerk's Doc. No. 104)

- •    Plaintiff's Surreply to Defendants' Motion to Allow Evidence Discovered After Discovery Deadline (Doc. No. 117) filed August 16, 2011.

(2)     Defendants' Motion to Strike Plaintiff's Evidence and Brief in Support (Clerk's Doc. No. 93)

- •    Plaintiff's Response to Defendants' Motion to Strike Plaintiff's Evidence and Brief in Support (Clerk's Doc. No. 100)

- •    Defendants' Reply to Plaintiff's Response to Defendants' Motion to Strike Plaintiff's Evidence (Clerk's Doc. No. 111)

- •    Motion to Strike Attached Affidavits (Clerk's Doc. No. 112)

- •    Plaintiff's Surreply to Defendants' Reply to Plaintiff's Response to Defendants' Motion to Strike Plaintiff's Evidence (Clerk's Doc. No. 118)

(3)     Plaintiff's Motion to Strike Defendant's Evidence and Brief in Support (Clerk's Doc. No. 96)

- •    Defendants' Response to Plaintiff's Motion to Strike Defendant's Evidence (Clerk's Doc. No. 103)

- •    Reply to Defendants' Response to Plaintiff's Motion to Strike Defendants' Evidence and Brief in Support (Clerk's Doc. No. 108)

- •    Defendants' Surreply to Plaintiff's Reply to Defendants' Response to Plaintiff's Motion to Strike Defendants' Evidence (Clerk's Doc. No. 119)

- •    Defendants' Response to Plaintiff's Surreply to Defendants' Response to Plaintiff's Motion to Strike Defendants' Evidence (Clerk's Doc. No. 120)

(4)     Plaintiff's Motion to Strike Evidence and Brief in Support (Clerk's Doc. No. 102)

• Defendants' Response to Plaintiff's Motion to Strike Defendants' Evidence (Clerk's Doc. No. 109)

• Plaintiff's Reply to Defendants' Response to Plaintiff's Motion to Strike Defendants' Evidence (Clerk's Doc. No. 113)

All of these evidentiary motions are referred for resolution. As is obvious from the length of the above list, these issues have been "amply" briefed by the parties.

## I.   BACKGROUND

Plaintiff Philip Cannata ("Plaintiff" or "Cannata"), who is proceeding pro se, was terminated from his position as Music Director at St. John Neumann Catholic Church on August 8, 2007.[1] Plaintiff alleges he was terminated in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623, *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(b)(5)(A). *See* Plaintiff's Complaint at ¶ 25-29. He sues both St. John Neumann Catholic Church ("St. John Neumann") and the Catholic Diocese of Austin ("the Diocese") (collectively "Defendants"). Defendants assert that Plaintiff was terminated, at least in part, due to insubordination.

Defendants move to dismiss Plaintiff's claims based upon the ministerial exception to jurisdiction. Defendants move for summary judgement on various bases. Defendants first argue that the Diocese is entitled to summary judgment as the Parish and the Diocese are separate entities, and Plaintiff was an employee of the Parish, not the Diocese. Second, Defendants assert that Plaintiff cannot make out a prima facie case for his ADEA and ADA claims.

---

[1]At the time, Plaintiff was also employed full-time at Oracle and taught classes at the University of Texas.

## II.     EVIDENTIARY ISSUES

Before addressing the merits of Plaintiff's claims, the Court must first address the various motions to strike evidence before the Court that both parties have filed.

### A.     Motion to Allow Evidence Discovered After Deadline

The first motion the Court must consider is Defendants' Motion to Allow Evidence Discovered After Discovery Deadline (Clerk's Doc. No. 91).  Defendants request that they be allowed to submit as summary judgment evidence a Catholic Church publication called the *General Instruction of the Roman Missal*, Exhibit D(4) to Defendants' Second Motion to Dismiss.  Plaintiff objects to the evidence because it was not disclosed to him prior to the discovery deadline.  The Court finds that Plaintiff will suffer no prejudice from the late production of this evidence, and there is good cause for its late production, and thus declines to exclude it.  Defendants' Motion to Allow Evidence Discovered After Discovery Deadline (Clerk's Doc. No. 91) is GRANTED.

### B.     Defendant's Motion to Strike Plaintiff's Evidence

Defendants also move to strike much of Cannata's summary judgment evidence (Clerk's Doc. No. 93).  They argue that the declarations and affidavits submitted by Plaintiff are unsworn, contain inadmissible hearsay, speculation, unfounded opinions, and legal conclusions. They complain that Cannata relies upon unauthenticated documents, that his witnesses' deposition testimony is inadmissible, and that he speculates and makes legal conclusions in his deposition. Defendants also object that Plaintiff mis-characterizes the evidence.  Finally, Defendants move to strike additional evidence Cannata submitted with his response.

The Court will defer going into the minutia of this motion, as there are literally dozens of specific statements to which Defendants object, and going through them one-by-one would be a

4

"forest for the trees" exercise.[2]  Instead, the Court makes the following general observations.  With regard to the authentication issues, the Court entered an Order on July 26, 2011, allowing Plaintiff leave to file an Amended Response to Defendants' Second Motion to Dismiss.  Through this Amended Response, Plaintiff has partially cured the authentication defects with regard to his evidence, and the Court will not disregard all of Cannata's evidence on this basis.  Additionally, the Court notes that Local Rule CV-26(d), states that "[a] party's production of a document in response to written discovery authenticates the document for use against that party in any pretrial proceeding or at trial unless . . . the party objects to the authenticity of the document, or any part of it, stating the specific basis for objection."  Defendants cannot thus now lodge authenticity objections to documents they themselves produced in discovery.  Accordingly, Defendants' arguments regarding the authentication of documents are largely without merit.  The Court notes however, that some of Plaintiff's evidence is in fact unauthenticated, is hearsay, or is otherwise inadmissible.[3]  Where there is such evidence that merits specific discussion, it will be addressed in the context of this report.

---

[2]This is just one of the dozens of objections:

Defendants object to ¶ 56 as follows: first sentence argumentative, misrepresentation of and improper comment on evidence contained in deposition exhibits and hearsay; second sentence as speculative, argumentative as to whether Cannata worked in good faith on the budget; third sentence, question called for Fr. Garner to comment on evidence and thereby provide irrelevant testimony, and documents referred to are the best evidence of their contents.

Clerk's Doc. No. 93 at ¶ 37.

[3]In this regard, the Fifth Circuit has noted that a self-serving affidavit is insufficient to overcome evidence submitted properly. *See Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010).  *See also Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004) (self-serving statements insufficient to prevent summary judgment, particularly when faced with "overwhelming evidence" in opposition*); BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996) ("conclusory, self-serving statement" by defendant insufficient to create a triable issue of fact).

For the reasons set forth above, Defendants' Motion to Strike Plaintiff's Evidence and Brief in Support (Clerk's Doc. No. 93) is GRANTED IN PART AND DENIED IN PART.

## C.  Plaintiff's Motion to Strike Defendant's Evidence and Brief in Support

In his Motion to Strike Defendant's Evidence and Brief in Support (Clerk's Doc. No. 96), Plaintiff moves to strike Exhibits D(3) and D(4) to Defendants' Second Motion to Dismiss and Motion for Summary Judgment.  Plaintiff objects to these two exhibits, *Liturgical Music Today*, and *General Instruction of the Roman Missal*, on various bases.  Plaintiff claims that Exhibit D(3) was not disclosed in a timely manner, that Defendants mis-characterized both exhibits, and that none of Defendants' expert witnesses rely on either exhibit.  Defendants respond that Plaintiff's claim that Defendants have mis-characterized the evidence goes to the weight of the evidence, and is not a proper basis to strike the exhibit.  Additionally, Defendants point out that attorney argument is not an attempt to inject that attorney's opinion into evidence; it is only argument.  They further point out that there is no requirement that an expert witnesses rely upon an exhibit in order for it to be admissible.  Lastly, Defendants assert that Exhibit D(3) was provided to Plaintiff prior to the close of discovery, just in a different form.

Plaintiffs' arguments regarding these exhibits are without merit.  The two exhibits in issue have been properly authenticated pursuant to FED. R. EVID. 901.  The relevance of any document is a determination to be made by the Court in weighing the evidence.  *See* FED. R. EVID. 403. Additionally, Exhibit D(4) was disclosed to Plaintiff prior to the close of discovery, albeit in a different form.  ACCORDINGLY, Plaintiff's Motion to Strike Defendant's Evidence and Brief in Support (Clerk's Doc. No. 96) is DENIED.

**D.      Plaintiff's Motion to Strike Defendant's Evidence and Brief in Support**

The last evidentiary motion is Plaintiff's Motion to Strike Defendant's Evidence and Brief in Support (Clerk's Doc. No. 102).  In this Motion, Plaintiff moves to strike various exhibits attached to Defendants' Second Motion to Dismiss and Motion for Summary Judgment, claiming the exhibits contain inadmissible hearsay, are unauthenticated, contain inadmissible deposition testimony, and contain speculative legal conclusions.  Plaintiff's Motion largely mirrors the claims Defendants asserted in their Motion to Strike Plaintiff's Evidence, and appears to be an attempt to retaliate, rather than to raise actual evidentiary deficiencies.  Having reviewed Plaintiff's objections to the evidence, the Court finds they are without merit and Plaintiff's Motion to Strike Defendant's Evidence and Brief in Support (Clerk's Doc. No. 102) is DENIED.

## III.    MOTION TO DISMISS

FED.R.CIV.P. 12(b)(1) requires dismissal of an action if the court lacks jurisdiction over the subject matter of the plaintiff's claim.  Motions submitted under that rule allow a party to challenge the court's subject-matter jurisdiction based upon the allegations on the face of the complaint. *Barrera–Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996); *see also Lopez v. City of Dallas*, No. 03–2223, 2006 WL 1450420, at *2 (N.D. Tex. May 24, 2006).

In ruling on a Rule 12(b)(1) motion to dismiss, the court may rely on (1) the complaint alone, presuming the allegations to be true, (2) the complaint supplemented by undisputed facts, or (3) the complaint supplemented by undisputed facts and by the court's resolution of disputed facts. *Freeman v. United States,* 556 F.3d 326, 334 (5th Cir. 2009).  Unlike a 12(b)(6) motion, the district court is empowered to consider matters outside the Complaint and matters of fact that may be in dispute. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  When examining a factual challenge

7

to subject-matter jurisdiction that does not implicate the merits of plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997); *see also Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986).  Accordingly, the Court may consider matters outside the pleadings, such as testimony and affidavits.  *See Garcia*, 104 F.3d at 1261.  A court's dismissal of a case for lack of subject-matter jurisdiction is not a decision on the merits, and the dismissal does not necessarily prevent the plaintiff from pursuing the claim in another forum.  *See Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).  The party asserting jurisdiction at all times maintains the burden of proving that jurisdiction does exist.  *Ramming*, 281 F.3d at 161.

### A.    Ministerial Exception

Defendants move to dismiss based upon the "ministerial exception" doctrine.  The "ministerial exception" precludes the federal courts from asserting jurisdiction in cases involving an employment dispute with a minister or church employee in a ministerial position.  *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972).  The doctrine is based upon the idea that when federal courts apply federal employment law statutes to the employment relationship existing between a church and its minister, "the State encroaches upon an area of religious freedom which it is forbidden to enter by the principles of the [F]ree [E]xercise [C]lause of the First Amendment."  *Id.* at 560; *see also Combs v. Central Texas Annual Conferences of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1990).

The Second, Sixth and Seventh Circuits have held that the ministerial exception is a jurisdictional issue that must be raised under Rule 12(b)(1).  *See Hollins v. Methodist Healthcare,*

*Inc.*, 474 F.3d 223, 225 (6th Cir. 2007); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006); *Rweyemamu v. Cote*, 520 F.3d 198, 206 (2nd Cir. 2008).[4]  Other circuits view the issue as one challenging the sufficiency of a claim, and thus treat the issue as raising a question to be reviewed under Rule 12(b)(6).  *See Petruka v. Gannon Univ.*, 462 F.3d 294, 302 (3rd Cir. 2006); *Bryce v. Episcopal Church of the Diocese,* 289 F.3d 648, 654 (10th Cir. 2002); *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 951 (9th Cir. 1999); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575. 1578 (1st Cir. 1989).

While not addressing whether 12(b)(1) analysis is proper or not, the Fifth Circuit has held that the Free Exercise Clause bars a minister's employment discrimination claims against a church. *Starkman v. Evans*, 198 F.3d 173, 177 (5th Cir. 1999).  This "bar" is akin to the bar of sovereign immunity which is also properly addressed under 12(b)(1) and determined prior to suit.  *See Sullivan v. Univ. of Tex. Health Science Center at Houston*, 217 F. App'x 391, 392 (5th Cir. 2007) (the Eleventh Amendment bars actions against a state entity in federal court by private parties seeking monetary relief).  As noted earlier, the Circuit has stated that "the application of the provisions of Title VII to the employment relationship existing between . . . a church and its minister would result in an encroachment by the State into an area of religious freedom which it is forbidden to enter by the principles of the [F]ree [E]xercise [C]lause of the First Amendment." *McClure*, 460 F.2d at 560. In effect, this approach is very similar to that of the First, Sixth and Seventh Circuits.  Thus, the Court believes that the proper vehicle under which it should review this issue is Rule 12(b)(1).  This

---

[4]An unpublished Eleventh Circuit decision also indicates that a dismissal based on the ministerial exception should be grounded in Rule 12(b)(1), not 12(b)(6).  *See McCants v. Alabama–West FL Conference of the United Methodist Church, Inc.*, 372 Fed.Appx. 39, 42 (11th Cir. 2010).

means that the Court will "weigh the evidence and satisfy itself as to the existence of its power to hear the case." *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992).

### B.   Factual Background

In determining what the operative facts are, the Court relies primarily on Cannata's own deposition.[5]  Cannata initially joined the St. John Neumann choir as an accompanist around 1990. *See* Cannata Deposition at 50, 65.  Shortly after, his wife and children became involved in the choirs. *Id.* at 70, 71.  In 1992 or 1993, John Hoffman, the Music Director at St. John Neumann, asked the Cannata family to perform at extra Masses during Easter and Christmas. *Id.* at 72.  In 1994 or 1995 Cannata and some of his nine children also performed at twice-monthly special Masses. *Id.* at 75.  Around this same time, Cannata and some of his children started performing at Saturday night Masses as well. *Id.* at 76.  The choir director was not present at these Masses, and Cannata prompted his children by playing the piano. *Id.* at 77.  After Hoffman left in 1998,  Cannata and his wife Rita "took over" the music. *Id.* at 101.  In 1998 Father Yeager asked Cananta to be the interim music director of St. John Neumann. *Id.* at 102.  Prior to that, he had been the Assistant Music Director for which he was paid $10,000 per year. *Id.* at 109.  Ultimately, Cannata was hired as the Music Director and his salary was bumped to $25,000 per year, and his wife Rita received an annual salary of $10,000 as the Assistant Music Director. *Id.* at 109-110.

After becoming Music Director, Cannata was responsible for the music at the Saturday night Mass, Sunday morning Masses, and for the choir. *Id.* at 115.  He and his wife Rita picked the music for each Sunday from a list of prescribed hymns contained in certain books. *Id.* at 126-129.  With

---

[5]As set out in the prior section, the Court is the fact-finder when resolving disputes related to its own jurisdiction.  Nevertheless, because Cannata is pro se, the Court has chosen to rely primarily on Cannata's own statements in determining whether it has jurisdiction to hear Cannata's complaint.

Cannata's help, his wife Rita also picked the octavos performed by the choir during the Mass. *Id.* at 130. When a parishioner requested to sing a particular song at Mass, it was the Cannatas who agreed to let her sing. *Id.* at 132-33. At a typical Mass, Cannata would direct the choir in four hymns, one octavo, one psalm, the Lord's Prayer, the Hallelujah, and the Kyrie. *Id.* at 133-34. Cannata practiced with the choir and taught them how to read music. *Id.* at 136-37. Cannata rehearsed the choirs on Tuesdays. *Id.* at 139. Cannata's stated method of rehearsing the choirs was to train them to read music and perform on their own, so he could act as an accompanist. *Id.* at 141-42. Cannata and Rita hired Leonard Johnson, the head of the University of Texas voice department to come in twice a month and work with the choirs. *Id.* at 138, 164. Cannata organized who would perform as cantors at the services. *Id.* at 169-170. Seven of his children acted as cantors along with other parishioners. *Id.* at 167-68. The Church hired Alan Rogers from the Austin Symphony to direct the brass choir, of which some of his children were members. *Id.* at 175. Cannata hired replacement cantors and piano players for the times he went on vacation. *Id.* at 181. He also printed and chose content for the worship aids handed out at Masses. *Id.* at 305.

Father Kirby Garner became the new pastor of St. John Neumann's in 2006. *Id.* at 193. The Church embarked on a building campaign during his tenure. On March 10, 2007, Cannata was informed he needed to cut the music budget to bring it down to $60,000 per year. *Id.* at 242, 246-47. He was told to keep the new proposed budget numbers to himself, and was given a deadline. to develop the budget. *Id.* at 251. Cannata met with Finance Council member Fred Yeo on March 11, 2007, and worked out a new music budget. *Id.* at 252-254. Cannata cut his own salary by $10,000 and also informed the Finance Council of the impact of the cuts, including cutting back the music at various services. *Id.* at 263-275. On May 17, 2007, the Church asked Cannata to perform an

inventory of the music department, which he did not complete until late July.  *Id.* at 308.  On June 20, 2007, Cannata had knee replacement surgery.  *Id.* at 336.  In early July 2007, Cannata determined that there was mold in the music room, which he ultimately reported to OSHA.  *Id.* at 337.  On August 8, 2007, Cannata was terminated.  *Id.* at 312.

## B.    The *Starkman* Factors

Whether an employee of a religious institution is a "minister" is a question of law for the court.  *Starkman*, 198 F.3d at 176.  The circuit courts have not adopted a uniform general test for making that determination.  Some courts utilize the "primary duties" test, which asks whether the employee's primary duties are religious in nature.  *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1243-44 (10th Cir. 2010);  *EEOC v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 597 F.3d 769, 778 (6th Cir. 2010),  cert. granted, —— U.S. ——, 131 S.Ct. 1783, (2011);[6] *EEOC v. Catholic University of America,* 83 F.3d 455, 463 (D.C. Cir. 1996);  *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168-1169 (4th Cir. 1985).  Others appear to use a version of the "primary duties" test, though without expressly adopting it*.  Petruska v. Gannon Univ.*, 462 F.3d 294, 304 n. 6, 306-07 & n. 10 (3d Cir. 2006);  *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 362-63 (8th Cir. 1991).  The Fifth Circuit has opted for a multi-factor test. *Starkman*, 198 F.3d at 175-77; *see also Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039-41 (7th Cir. 2006) (discussing several factors).  This Court will thus employ the *Starkman* test in its analysis.

Generally, the "ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission." *See*

---

[6]This Supreme Court granted cert in this case to resolve the circuit split on this issue.

*EEOC v. Catholic University of America,* 83 F.3d 455, 463 (D.C. Cir. 1996). An employee's job title is not dispositive. *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 704 n. 4 (7th Cir. 2003). Instead, courts consider the realities of the "function of the position at issue" to determine whether the position is ministerial in nature. *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000); *Starkman,* 198 F.3d at 176 (finding that to determine whether Ms. Starkman qualified as a "spiritual leader" for purposes of the ministerial exception, the court examined the employment duties and requirements of the plaintiff as well as her actual role at the church) (citing *EEOC v. Southwestern Baptist*, 651 F.2d 277, 285 (5th Cir. 1981)). "As a general rule," an employee's position will be considered "ministerial" if his or her "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship" or if the "position is important to the spiritual and pastoral mission of the church." *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985).[7] However, the "exception would not apply to employment decisions concerning purely custodial or administrative personnel . . . [w]here no spiritual function is involved." *Roman Catholic Diocese*, 213 F.3d at 801.

In *Starkman*, the Fifth Circuit articulated a three-part test to determine whether an employee's primary duties are ministerial in nature: (1) "whether employment decisions regarding the position at issue are made 'largely on religious criteria,'" (2) "whether the plaintiff was qualified and authorized to perform the ceremonies of the Church," and (3) "probably most important is whether [plaintiff] 'engaged in activities traditionally considered ecclesiastical or religious.'" 198 F.3d at 176–77 (citations omitted). The *Starkman* court held that it is "sufficient" to deem an employee's

---

[7]While this Court does not employ the "primary duties test," it is instructive as to the Court's analysis in this case.

function "ministerial" if only the third prong is satisfied.  *Id.* at 177 (choir director was minister because church music "constitutes a form of prayer that is an integral part of worship").

### 1.  Employment decision made largely on religious criteria?

Defendants generally assert that the St. John Neumann's decision to hire a Music Director was made largely on religious criteria.  Defendants assert that the Catholic Church believes that the music director functions as a "lay ecclesial minister" and that all musicians who perform in the church exercise a "genuine liturgical ministry."  *See* Defendants' Second Motion to Dismiss at p. 4 citing to Defendants' Exhibit D(2) and D(1).  Defendants also assert that "the Church believes that a music director provides a major service by overseeing the planning, coordination, and ministries of the parish or diocesan liturgical music program; fostering the active participation of the liturgical assembly in singing; and promoting the choirs, psalmists, cantors, organists, and all who play instruments that serve the Liturgy."  *See* Defendants' Second Motion to Dismiss at p. 5 citing to Defendants' Exhibit D(1).  Defendants also cite to the expert testimony of Father Richard Wahl and Mrs. Cheryl Maxwell that a music leader is considered a lay ecclesial minister according to the Canon Law of the Roman Catholic Church.  Defendants' Exhibit E at p. 4.

Cannata contends that he was merely a bookkeeper, sound person, custodian and accompanist, and did not serve any ministerial or pastoral functions.  Cannata argues that his position was entirely secular and that he did not have any special education or experience in liturgical music or liturgical norms.  *See* Plaintiff's Exhibit S.  Thus, Cannata asserts, his position as Music Director did not qualify as a "lay ecclesial minister."  He relies upon Defendants' Exhibit 2, *Co-Workers in the Vineyard of the Lord*, printed in 2005, by the United States Conference of Catholic Bishops, claiming that to qualify as a "lay ecclesial minister" one must experience a period of Discernment

and Determination of Suitability; a period of Human, Spiritual, Intellectual, and Pastoral Formation; and authorization by the church hierarchy, certification, and appointment in writing with appropriate publication. *See* Defendants' Exhibit 2 at 27-60. Cannata contends that he did not engage in any of the activities and cannot be declared a lay ecclesial minister merely based upon his job title.

For evidence of Plaintiff's job duties, Defendants rely upon a job description for the Music Minister created in early 2007, and signed by Cannata. Defendants' Exhibit C. The job description includes a "Brief Job Summary" that reads:

> This position reports to the Pastor and is responsible for leading, coordinating, evaluating and guiding the Choirs, Cantors, Orchestra and instrumental musicians that participate in St. John Neumann Catholic Church liturgies except for the 5:30 Sunday evening Mass. This position has wide authority to exercise independent judgment and discretion within the scope of the job.

Among the "Essential Duties" are:

- Produce high quality liturgical music for St. John Neumann Catholic Church

- Provide guidance and leadership to volunteer choirs, cantors and instrumental musicians including rehearsals, preparation and music selection

The description also requires "knowledge of" the following:

- liturgical procedures for Sunday Masses, Holy Days of Obligation including especially Holy Week and Easter

- a wide range of liturgically appropriate music including Gregorian chant

- documents and teachings of the Catholic Church related to music ministry.

Cannata disputes that this job description was binding or descriptive of his actual duties. He asserts that when he became Music Director in 1998 he had no job description and that the 2007 job description was created "as part of an exercise conducted by the Austin Diocese for all Departments at the Parish during the Spring of 2007, just a few months before I was terminated." Declaration of

Cannata at ¶ 21.  Cannata also contends that, while he is Catholic, two of his three predecessors as Music Director were not.  *Id.* at ¶ 12.  Reviewing the evidence properly before it, the Court finds that Defendants have not submitted competent evidence of the selection criteria used at the time Cannata was initially employed as Music Director by St. John Neumann, or of the criteria used to continue him in that position.  The evidence before the Court supports the idea that Cannata greatly expanded the job duties of Music Director over his eight-plus-year tenure at St. John Neumann, and thus it is not clear what the criteria were that St. John Neumann used in hiring and retaining Cannata.  Accordingly, the Court declines to find the ministerial exception on this basis.

### 2.      Qualified and authorized to perform the ceremonies of the Church?

The second *Starkman* factor addresses whether Cannata was qualified and authorized to perform ceremonies of the church.  In *Starkman*, the Fifth Circuit found the ministerial exception applicable to Starkman because she was qualified and authorized to perform the church's ceremonies, and had several religious duties and responsibilities.  For example, the court relied upon the fact that she was required to plan worship liturgy, coordinate church and worship activities relating to the church's Music Ministry, rehearse with choirs and conduct those choirs, hire musicians and lower level music ministry directors, and write articles about the church's Music Ministry for the weekly church bulletin.  *Starkman*, 198 F.3d at 176.

In this case, the evidence properly before the Court shows that Cannata performed duties similar to those performed by Ms. Starkman.  Despite his claims that he was merely an accompanist, sound man, and bookkeeper, Cannata's own deposition reveals that he was much more.  He testified that as Music Director he was responsible for the music at the Saturday night Mass, Sunday morning Masses, and for the choir, *see* Cannata Deposition at p. 115; that at a typical Mass he would direct

16

the choir in four hymns, one octavo, one psalm, the Lord's Prayer, the Hallelujah, and the Kyrie, *id.* at 133-34; he picked the music for each Sunday from a list of prescribed hymns contained in certain books, *id.* at 126-129; picked the octavos performed by the choir during the Mass, *id.* at 130; determined who could perform at the Masses and what music they could perform, *id.* at 132-33; practiced with the choirs every Tuesday and taught them how to read music, *id.* at 136-37, 139, 141-42; hired various outside coaches to help with the choirs, *id.* at 138, 164, 175; organized who would perform as cantors at the services, *id.* at 169-170; hired replacement cantors and piano players for the times he went on vacation, *id.* at 181; and printed and chose content for the worship aids handed out at Masses, *id.* at 305.

Cannata denies that he led the choir; however, the Defendants have provided evidence in the form of a letter from a choir member Gayle Nix, after Cannata dismissed her from the choir, that shows that in actuality Cannata directed the choir. *See* Exhibit M, Exhibit 13 to Gesch Deposition, Bates No. 354 to Defendants' Second Motion to Dismiss. The letter, dated May 16, 2003, states "you took the opportunity to share your views on what you considered to be my inappropriate behavior in your choir" and "your style of directing evidently leaves no room for collaborative learning." The letter also states, "I'm sure that all choir directors wish that their choir members looked more at them, and less at the music. Guilty as charged."[8] Cannata was more than a mere accompanist.

---

[8]Neither party objected to this letter. At first glance, it might be contended that the letter is hearsay. The letter came from the Plaintiff's personnel file, and thus may fit within the business records exception to the hearsay rule. Regardless, it appears that the letter does not qualify as hearsay, because it was not offered to prove the truth of the matter asserted—whether Cannata in fact made certain statements or what his style of directing was—but rather only to show that Cannata actually directed, and did not merely accompany, the choir.

While Cannata tries to downplay his liturgical responsibilities, stating that some were performed by his wife Rita as Assistant Music Director, or by him in conjunction with Rita, he was Rita's supervisor, and the evidence shows that Cannata was responsible for and performed various Church ceremonies.  The evidence also shows that as part of his position, Cannata was required to know the order of the Mass, including what exactly comprises the Mass and which parts are or can be musical.  *See* Cannata Deposition  78-89, 183.  Additionally, although he denies any input into worship liturgy or other liturgical choices, Cannata states in his letter of January 6, 2003, "here was an announcement for a Liturgical Music Workshop to be held at our parish in a week that I, Director of Liturgical Music for the parish, knew nothing about."  *See* Exhibit 1 to Cannata Deposition.  The evidence shows that Cannata himself played a role in liturgical choices.  *See* Cannata Deposition at 126-130.  A timeline prepared by Cannata also substantiates the fact that he was involved in musical and liturgical choices for events such as funerals.  *See* Exhibit M to Defendants' Second Motion to Dismiss, Exhibit 31 to Gesch Deposition.  Moreover, the job description—authored at least in part by Cannata and signed by him—shows that he performed liturgical duties.  Even if, as Cannata claims, the job description covered every person hired and employed by the Music Director, ultimately the final authority and responsibilities for those duties rested with the Music Director—Philip Cannata.

Lastly with regard to this point, Cannata argues that *Archdiocese of Washington v. Moersen*, 399 Md. 637, 639, 925 A.2d 659 (2007), should be controlling in this case.  In *Moerson*, the Court of Appeals of Maryland found the ministerial exception did not apply to a church organist.  The Court based its opinion on the fact that Moerson was not listed as a member of the church staff, was not required to attend meetings, supervised no one, did not lead the church choirs, and was not

required to profess a specific faith.  The court found that Moerson was an organist, and only an organist.  Leaving aside the obvious fact that the case is not a federal case, and not from this jurisdiction, *Moerson* is plainly distinguishable from the case at hand.  Cannata was clearly more than an accompanist.  Cannata had supervisory responsibilities, attended meetings,[9] was identified as a Church employee, and was the Music Director, a job that entailed making sure that all of St. John Neumann's musical needs were met.  As stated in St. John Neumann Business Administrator Judy Gesch's notes about how Cannata proposed to reduce his duties after his budget was cut:

> At one point I asked Phil, "if you don't play for the Saturday, 5:30 pm Mass, there isn't any Music for the 7:30 am, the 9:00 would have a choir/cantor and no cantor or choir at the 11:30 am Mass and no participation with the 5:30 Sunday Mass, what the hell do I need you for?"  I suspect that some of the proposed cuts were always considered a throw away but many of the cuts were *the main reason a church would hire a Music Director.*

*See* Exhibit M to Defendants' Second Motion to Dismiss, Exhibit 34 to Gesch Deposition (emphasis added).  The evidence shows that Father Kirby relied upon and expected Cannata to make all arrangements for music at the Masses.  *See* Exhibit M to Defendants' Second Motion to Dismiss, Exhibit 43 to Gesch Deposition.  In fact, Father Kirby asked if Cannata could provide him with hymns for the Masses when Cannata would be on vacation. *See* Exhibit M to Defendants' Second Motion to Dismiss, Exhibit 41 to Gesch Deposition.  St. John Neumann's expected Cannata to plan and provide the music for its Masses.  All of this evidence shows that Cannata was qualified and authorized to perform ceremonies in the church, and the second factor of the *Starkman* test is met here.

---

[9] *See* Exhibit M to Defendants' Second Motion to Dismiss, Exhibit 37 to Gesch Deposition, Meeting Notes for Music Department Meeting attended by Cannata, Father Garner, Father Evans, and Judy Gesch.  Notably, Cannata alone represented the music department.

### 3. Engaged in activities traditionally considered ecclesiastical or religious?

The third *Starkman* factor, most determinative in this case,  is whether Cannata "engaged in activities traditionally considered ecclesiastical or religious," *Southwestern Baptist*, 651 F.2d at 284. In *Starkman*, the Court found that Starkman engaged in activities traditionally considered ecclesiastical or religious.  In part, the Court relied upon the fact that Starkman conceded that "for her and her congregation, music constitutes a form of prayer that is an integral part of worship services and Scripture readings." *Starkman*, 198 F.3d at 177.  The evidence before the Court shows that this is also true for St. John Neumann Catholic Church.

The evidence before the Court shows that Cannata participated in liturgical functions at worship services or Masses.  Listed as his essential duties in the January 2007 job description are: producing high quality liturgical music for St. John Neumann Catholic Church; providing guidance and leadership to volunteer choirs, cantors, and instrumental musicians including rehearsals, preparation, and music selection; and accompany choirs, cantors, and instrumentalists on the keyboard at liturgies.  *See* Defendant's Exhibit C.  Additionally, the job description states that the Music Director should have knowledge of: liturgical procedures for Sunday Masses, Holy Days of Obligation, including especially Holy Week and Easter; a wide range of liturgically appropriate music including Gregorian chant; and documents and teachings of the Catholic Church related to music ministry.  *Id.* at 2.  Cannata does not dispute that he participated in the Masses at St. John Neumann.

Defendants have presented evidence, through the opinion of Father Wahl, presented as an expert in the Canon Law of the Catholic Church, that the Catholic Church believes that music in the liturgy is part of the celebration and a part of the prayer that is occurring at the Mass.  "Music

enhances the liturgy and is not considered a performance." *See* Defendant's Exhibit E, Affidavit of

Father Richard Wahl.  Wahl goes on to state:

> In the Catholic Church, sacred music supports the Church's prayer by enriching its
> elements.  A music director is integral to the Catholic Mass, including the celebration
> of the Liturgy of the Word and Liturgy of the Eucharist.  The music director is also
> integral to the celebration of the other important religious ceremonies and sacraments
> of the Catholic Church . . . . A music director also serves the Church's spiritual and
> pastoral missions by designing and implementing a music program through which the
> faithful are able to more appropriately worship God in the Mass, other liturgies, and
> prayerful events.  Additionally, through music, the Music Director is to develop
> fellowship among the faithful.  As such, the Music Director at the Church leads an
> important spiritual and religious fellowship or the Church that is essentially religious
> in nature.  In conclusion, the Music Director, including Mr. Cannata in his tenure, is
> a worship leader of the Church.

*Id.*  Additionally, Defendants present the Affidavit of Cheryl Maxwell, Director of the Office of

Worship for the Diocese of Austin, stating that "music is part of the liturgy of the Catholic Church."

*See* Defendant's Exhibit F.  Maxwell also states, "the person who leads the music at the Catholic

Mass is considered an integral part of the Mass and is a lay liturgical minister actively participating

in the sacrament of the Eucharist."  *Id.*

Plaintiff's general response is that he was merely a secular accompanist, that not he, but his

wife picked the music for Mass, and that the job description detailed above was not for his job alone,

but covered the job duties of Plaintiff, his wife Rita, his daughter Jeanette, the Choir and Cantor

coach, Leonard Johson, and the Brass Choir Director, Alan Rogers.  *See* Response at p. 5.  Plaintiff

maintains that he had no religious duties, and he did not lead the music at the Mass, but the Choir

and the Cantors did.  *Id.* at p. 6.  He also asserts that Father Bud Roland testified that an accompanist

at a Catholic Mass need not be Catholic.  *See* Plaintiff's Exhibit N, Deposition of Father Bud Roland

at p. 225.

This position ignores significant uncontroverted evidence.  As Music Director, Plaintiff's responsibility was to lead and provide music for the Mass, including liturgical portions such as the Psalm and Kyrie.  Plaintiff was not merely an accompanist and the evidence does not support that he believed this.  He stated in a letter to Deacon Ron Walker dated March 13, 2008, that, "we rightly thought that by our labor we were helping to unfold the Creator's work and contributing, by our personal industry, to the realization in history of the divine plan."  *See* Exhibit G, Attachment A.  Plaintiff has presented no evidence that somebody else led the Choir at the Masses.  Plaintiff's claims that the choir led itself is without merit, as is shown by Gayle Nix's letter described above.  It is evident that Father Kirby relied upon Plaintiff to provide the music for the Masses.  *See* Deposition of Judy Gesch, Exhibit 41 (e-mail requesting what arrangements Cannata had made for the Masses).  Moreover, even assuming he delegated some of his duties to others, Plaintiff was responsible for the final product presented to the congregation.  His role as Music Director was ecclesiastical and spiritual.

In *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000), that Court held that the director of music ministry and part-time music teacher at a religious school qualified as a minister for purposes of the ministerial exception because her position was "bound up in the selection, presentation, and teaching of music, which is an integral part of Catholic worship and belief."  That Court went on to say:

> to hold otherwise would require us to say that music is substantially devoid of spiritual significance in the life of the church.  Such a view cannot stand in light of the role of religious music in worship and the record in this case.  At the heart of this case is the undeniable fact that music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred.

*Id.* at 802.   Other jurisdictions, employing a similar analysis, have also found that the role of "music director" fell within the ministerial exception. *Tomic*, 442 F.3d at 1037, 1042 (holding that church music director and organist had religious duties because the way music is played at a mass has the ability to alter the worship experience for the parishioners); *Miller v. Bay View United Methodist Church, Inc.*, 141 F. Supp. 2d 1174, 1183 (E.D. Wis. 2001) (holding that a church music director's discrimination claims were barred by the ministerial exception because plaintiff "engaged in traditionally ecclesiastical or religious activities"); *Egan v. Hamline United Methodist Church*, 679 N.W.2d 350, 354 (Minn. Ct. App. 2004) (holding that the church music director played a religious role and thus ministerial exception applied).

As Music Director, Cannata performed functions that are considered ecclesiastical or religious.   He participated in religious rituals and played a spiritual leadership role at St. John Neumann Catholic Church.   His dismissal from his position as Music Director was painful for him and his family (who were also highly involved in the Church), expressly because of the relationship between his position at St. John Neumann's and his spiritual beliefs. Accordingly, the ministerial exception applies and Cannata's ADEA and ADA claims are barred.[10]

## IV.   RECOMMENDATION

The undersigned Magistrate Judge **RECOMMENDS** that the District Judge **GRANT** Defendants' Second Motion to Dismiss Pursuant to FRCP 12(b)(1) (Clerk's Doc. No. 84), and dismiss Plaintiff's suit without prejudice as barred by the ministerial exception.   The Court **FURTHER RECOMMENDS** that all other pending motions be denied as moot.

---

[10]The Court has not addressed Defendants' motion for summary judgment, given its conclusion that the ministerial exception bars its consideration of the merits of Cannata's claims.

23

## V.     WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 16th day of September, 2011.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE